UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DALE LESTER MORRIS,

    *Plaintiff*,

v.

HEIDI WASHINGTON, CARMAN MACINTIRE, and
SHERMAN CAMPBELL,

    *Defendants*.

CASE NO. 20-cv-13268

DISTRICT JUDGE NANCY G. EDMUNDS
MAGISTRATE JUDGE PATRICIA T. MORRIS

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS (ECF No. 25), PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' MOTION (ECF No. 27), MOTION FOR TRANSFER (ECF No. 28), and MOTION FOR ACCESS TO LEGAL MATERIAL (ECF No. 22)**

I.    **RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' motion to dismiss be **GRANTED**, (ECF No. 25), and Plaintiff's motions (ECF Nos. 22, 27, 28) be **DENIED** as moot.

II.    **REPORT**

    A.    **Background**

Plaintiff, an inmate housed at the Gus Harrison Correctional Facility, filed the instant *pro se* complaint on December 1, 2020. (ECF No. 1.) Plaintiff brings his claim under 42 U.S.C. § 1983, alleging that Defendants Washington, director of the Michigan

1

Department of Corrections (MDOC), MacIntire,[1] chief medical officer of the MDOC, and Campbell, a warden, violated Plaintiff's Eighth Amendment rights through "deprivation of a basic human need" and deliberate indifference. (ECF No. 1, PageID.4.)

Plaintiff alleges that Defendants violated the Eighth Amendment when they "illegally" transferred 55 inmates, who apparently had COVID-19, to Plaintiff's housing unit. (ECF No.1, PageID.26.) Plaintiff claims that the housing unit was "overcrowded" and in "deplorable conditions" with "no ventilation." (*Id.*) According to Plaintiff, Defendants failed to comply with "CDC approved housing standards" regarding the 55 "illegal" inmates. (*Id.*)

Plaintiff specifies, however, that his claim is not related to the MDOC's cleaning procedures or measures taken to control spread of the virus—Plaintiff "prays that his action is not dismissed as so, or in conjunction with all of the other previous filed 1983 claims against the [MDOC] from prisoners . . . ruling that the MDOC was not culpable because the MDOC . . . took action to prevent the spread of the virus." (*Id*. at PageID.27.)

Rather, Plaintiff avers that his complaint is based on Defendants "foisting . . . the disease on Plaintiff . . . while working under the color of state . . . when they conspired, [plotted], [planned] and executed their dastardly plan[.]" (*Id*. at PageID.29.) Plaintiff sets forth that Defendants were able to accomplish this plan "under the guise of [] a disease step down program, which was actually a ploy to defraud the federal government of COVID-19 pandemic funding monies." (*Id.*)

---

[1] I note that this defendant's name is spelled variously as MacIntire (ECF No. 1, PageID.1), MacIntyre (ECF No. 25, PageID.146), and McIntyre. (ECF 25, PageID.146.) This Report and Recommendation will use the spelling MacIntire as seen in Plaintiff's complaint and as reflected on the docket.

2

In his attached affidavit, Plaintiff contends that on April 3, 2020, Campbell acted on orders from Washington, and "sanctioned" by MacIntire, to transport 55 inmates who were "infected carriers" of COVID-19 into a compound. (*Id*. at PageID.29, 31.) Included in this compound were "1,700 +" uninfected prisoners. (*Id*. at PageID.31.) Plaintiff claims that Defendants did not "allocate for three shifts of correctional officers and nursing staff"; there was a lack of ventilation in the 600 block, where the allegedly infected prisoners were brought; and proper measures were not taken to ensure that any virus from those prisoners was not shared outside of that block. (*Id*. at PageID.32.)

On April 6, 2020, Plaintiff was informed that Defendants were initiating a "coronavirus disease step-down program." (*Id*. at PageID.33.) On April 9, 2020, an inmate on "the ARF's level one south side" contracted COVID-19, allegedly from a nurse. (*Id*.) Plaintiff claims that the nurse was also working with the 55 inmates in the 600 block. (*Id*. at PageID.33-34). After April 9, 2020, COVID-19 "took off spreading" throughout the previously uninfected inmates in the ARF compound. (*Id*. at PageID.35.) Plaintiff claims that by June 4, 2020, one correctional officer and five inmates died due to the virus, and in mid-April 2020, Plaintiff himself contracted the virus. (*Id*. at PageID.35-36.)

Plaintiff complains that Defendants violated a travel ban order by transferring the 55 inmates. (*Id*. at PageID.36.) Plaintiff also complains that the ARF compound where he and others are housed is designed for only four inmates per space, but currently holds eight, and the inmates cannot comply with the CDC's recommend six-foot social distancing guidelines. (*Id*. at PageID.36-37.) Plaintiff further complains that there is no ventilation where he is housed. (*Id*. at PageID.37.)

In conclusion, Plaintiff complains that the "step-down" program, which was "the product" of Defendants, was a "ploy" "designed to commit fraud on the federal government, having [G]us [H]arrison [C]orrectional [F]acility labeled as a biohazardous work environment to enable it's C.O.'s and staff to receive COVID-19 federal grant triple hourly pay wages monies along [with] personal protection equipment gear (PPE) purchasing federal grant monies." (*Id*. at PageID.38-39.)[2]

Plaintiff requests, as a form of relief, $500,000, the payment of lifetime medical insurance by the provider of Plaintiff's choice, the "cost of suit, and reasonable attorney's fees and cost of copies and postage," (ECF No. 1, PageID.41), and punitive damages and other relief as a jury may see fit.

### B.  Motion to Dismiss Standard

---

[2] I also note a separate issue that Plaintiff raises in his initial filing. In his affidavit regarding the grievance procedure, he mentions an "attempt to silence [a] writer's First Amendment [r]ight[.]" (ECF No. 1, PageID.19.) Plaintiff wrote "an exposé" on the above discussed "dastardly deed" allegedly carried out by Defendants—that they labeled the housing unit a biohazard in order to receive federal funding and "triple hourly pay" for the state employees of the housing unit. (*Id*.) Plaintiff alleges that a "jailer" by the name of "Turn-Key Miller" threatened Plaintiff regarding a blog he posted—the "PAGEZ Organization Media Blog." (*Id*. at PageID.19.) Miller apparently stated, "you don't want me to go back to how I use[d] to be, so I suggest you let it go, take it down[.]" (*Id*. at PageID.19-20.) Plaintiff interpreted this as "an overt threat to this writer's well being and life." (*Id*. at PageID.20.) Plaintiff writes that he "now feels his life is in jeopardy and fears of being set-up with a shank (knife) or some form of contraband being placed in writer's area of control by Turn-Key Miller or one of his many cronies." (*Id*. at PageID.20.) He later bases his motion to transfer on these events and the conduct of Miller. (ECF No. 28; *see infra* footnote 3.)

In his "preliminary statement," which appears to be the substance of Plaintiff's actual complaint, Plaintiff only mentions these allegations at the very end, and does so briefly, under the heading "TAKE NOTICE." (ECF No. 1, PageID.42.) Rather, these allegations are mentioned primarily, and in detail, in Plaintiff's affidavit regarding the grievance process. (ECF No. 1, PageID.19-20.) Plaintiff's complaint does not raise these allegations as claims against Defendants. Plaintiff, although *pro se*, appears to be sophisticated enough to complete the necessary forms, respond to orders and motions, and present a clear and plain statement of the facts of his complaint. Although *pro se* filings are to be liberally construed, I suggest that if Plaintiff intended to raise these allegations as claims in this complaint he would have included "Turn-Key Miller" as a party and properly included them in the complaint. As such, I find these are not claims to be considered as part of the complaint and the undersigned will not analyze them here.

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the complaint with regard to whether it states a claim upon which relief can be granted. When deciding a motion under this subsection, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001). As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, a complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007) (rejecting the traditional Rule 12(b)(6) standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). Under Rule 12(b)(6), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

The Supreme Court has explained that the "tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although Rule 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era," it "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."

5

*Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth . . . . When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)). This circuit has further "held that 'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim.'" *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (quoting *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)); *Yeary v. Goodwill Indus.–Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997).

To state a claim under § 1983, a plaintiff must allege facts showing (1) the conduct about which she complains was committed by a person acting under color of state law and (2) the conduct deprived her of a federal constitutional or statutory right. In addition, a plaintiff must allege that he or she suffered a specific injury as a result of the conduct of a

6

particular defendant and she must allege an affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976).

### C. Defendants' Motion to Dismiss

Defendants point out, accurately, that Plaintiff's argument rests not on the contention that MDOC failed to properly adhere to COVID-19 guidelines and protections, but that "the creation of a COVID-19 step-down unit at ARF was a part of a fraudulent scheme to defraud the federal government of federal grant monies." (ECF No. 25, PageID.162 (citing ECF No. 1, PageID.29.)) Defendants argue that "Plaintiff offers no factual support whatsoever for this conspiracy theory, and it is easily refuted by publicly available documents." (ECF No. 25, PageID.163.)

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record . . . also may be taken into account." *Nieman*, 108 F.3d at 1554. Defendants argue that "publicly available documents clearly support the reasonableness of MDOC's early COVID response measures" and refer to affidavits from Washington and MacIntire that were provided in *Abrams, et al v. Chapman, et al*, No. 20-cv-11053 (E.D. Mich., Hon Mark A. Goldsmith). (ECF No. 25, PageID.148.)

Defendants refer to their provided Exhibit A, the affidavit of Defendant Washington. Exhibit A addresses the creation of the step-down unit with which Plaintiff takes issue. In the affidavit, Defendant Washington testifies that these step-down units were

7

created "for all prisoner[s] who previously tested positive for COVID-19 and have since been cleared by the MDOC's CMO, are symptom free, and are no longer considered contagious." (ECF No. 25, PageID.163 (citing Ex. A, ¶ 15(b)).) Defendants point out that Exhibit A provides: "'[p]risoners remain in the step-down unit for at least 14 days and until a negative COVID test is obtained before being released to general population.'" (*Id.* (quoting Ex. A, ¶ 15(b)).)

Next, Defendants rely on Defendant MacIntire's affidavit at Exhibit B. (ECF No. 25, PageID.164.) Relying on MacIntire's affidavit, Defendants argue that the step-down unit "utiliz[ed] a comprehensive inmate management protocol, including a discussion of quarantine procedures and the use of COVID positive cohort units and specialized units (including step-down units) to help treat COVID positive inmates, and the criteria for considering transfers on a case by case basis using specific protocols." (ECF No. 25, PageID.164 (citing Ex. B, ¶¶ 28, 32, 33, 34, 35.))

Finally, Defendants provide a letter from MDOC to its employees regarding the implementation of the step-down unit. The letter provides,

> The prisoners coming to ARF will only be those who have been medically cleared by our chief medical officer and are symptom free. So far about 40 prisoners have recovered and have moved to the step-down unit. There have been more prisoners that have recovered than have been admitted to the hospital and that is a positive and encouraging sign.
>
> The setup at ARF is just like the units at G. Robert Cotton Correctional Facility and Carson City Correctional Facility. It sits outside the main perimeter of the prison, but has perimeter fencing around it. The staff who volunteered to work there report directly to that unit and do not come in contact with any prisoners or staff in the main prison.

8

(ECF No. 25, Ex. C, PageID.305.)

Defendants' first argument in support of their motion is that Plaintiff has not sufficiently alleged the personal involvement of the named Defendants. (ECF No. 25, PageID.170.) They argue, "Plaintiff's 'Complaint' fails to allege any specific facts demonstrating that [] Defendants Washington, McIntyre [sic], or Campbell authorized, approved or knowingly acquiesced in any unconstitutional conduct towards the Plaintiff." (*Id.* at PageID.171.) Defendants also argue that Plaintiff has not shown a likelihood of prevailing under the Sixth Circuit's standard for Eight Amendment COVID-19 claims. (*Id.* at PageID.173.)

### D.     Analysis

#### 1.     Eighth Amendment Standard and COVID-19 Claims

Defendants argue that Plaintiff cannot prevail on the merits of his claim under the Sixth Circuit's standard for evaluating COVID-19 claims in the prison context. (ECF No. 25, PageID.173.) Although Plaintiff insists that his claim is not "a civil action [Eighth] [A]mendment claim based on, [whether] or not the MDOC took assiduous measures to stay clean[,]" he does bring the claim under the Eighth Amendment, and it must be analyzed under that standard. My reading of Plaintiff's complaint suggests that he wishes to emphasize this is not a "typical" COVID-19 case wherein he argues that his Eighth Amendment is violated by sub-standard COVID-19 related conditions in the prison. Rather, he alleges a more specific violation of his Eighth Amendment rights—that Defendants conspired to bring infected prisoners into his unit, thus exposing him to COVID-19, for federal funding. Regardless, the alleged injury here is still founded in the

9

Eighth Amendment. Plaintiff pleads that this Court recognize the difference in his Complaint, and I believe I have properly done so; the fact remains that such an allegation must still be analyzed under the relevant standard.

I pause here to note that in my liberal reading of Plaintiff's complaint, as is required for a *pro se* party, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), Plaintiff seems to focus on a conspiracy between Defendants to bring infected inmates to a certain housing unit for federal funding, although he does not specifically allege the elements of a conspiracy, nor does he bring this case under a conspiracy statute. Even under a liberal reading of the complaint, the undersigned declines to make arguments on Plaintiff's behalf regarding a conspiracy claim. Thus, the analysis centers on The Eighth Amendment, under which Plaintiff brings his claims.

### a. Eighth Amendment Standard

In *Estelle v. Gamble*, the Supreme Court held "that deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment's Cruel and Unusual Punishment Clause because it constitutes the "unnecessary and wanton infliction of pain" and is "repugnant to the conscience of mankind" by offending our "evolving standards of decency." 429 U.S. 97, 103-106 (1976) (internal citations omitted.) To establish a cognizable claim, Plaintiff's allegations must show Defendant's "sufficiently harmful" acts or omissions. *Id.* at 106. "[I]nadvertent failure to provide adequate medical care . . . will not violate the Constitution." *Id.* at 105-106.

The "deliberate indifference" inquiry has objective and subjective elements. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective inquiry asks whether the deprivation

was "sufficiently serious," which a claimant satisfies when his or her condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (citation omitted). The former standard focuses on the "effect of delay in treatment." *Anthony v. Swanson*, 701 F. App'x 460, 463 (6th 2017). In *Napier v. Madison Co.*, 238 F.3d 739 (6th Cir. 2001), the court held that a plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" *Id.* (citation omitted). This rule applies more broadly to claims "based on the prison's failure to treat a condition adequately." *Blackmore v. Kalamazoo Co.*, 390 F.3d 890, 898 (6th Cir. 2004). The Sixth Circuit recently explained that

> when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony ... showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are serious"). The plaintiff also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment.

*Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).

11

The subjective inquiry, by contrast, considers whether official's state of mind was sufficiently culpable; it requires a showing that an official "'knows of and disregards an excessive risk to inmate health or safety[.]'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quotation omitted). "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.*

The Supreme Court examined the subjective prong in *Farmer v. Brennan*, 511 U.S. 825, 834-847 (1994). The subjective nature of deliberate indifference follows from the Eighth Amendment's principle proscription of "only the unnecessary and wanton infliction of pain," and focus on the defendant's culpability. *Id.* at 834 (citation omitted). The culpable state of mind, the Court said, was more than indifference. *Id.* at 835. But not so much more that the defendant must intentionally or purposefully inflict injury. *Farmer*, 511 U.S. at 836. Instead, as noted above, the standard turns on whether the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The upshot, for present purposes, is that defendants who "responded reasonably to the risk," even if the potential harm subsequently eventuates, have not violated the Eighth Amendment. *Id.* at 844-845.

### b. Eighth Amendment Analysis

Defendants argue that the complaint fails to state a claim for deliberate indifference because MDOC responded reasonably to the COVID-19 pandemic, citing *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). (ECF No. 25, PageID.175-76.)

First, the objective component: Plaintiff has demonstrated that he is "incarcerated under conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834, and thus has satisfied the objective component regarding his claims as to virus protection. The Sixth Circuit held the same in *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020):

> In assessing the objective prong, we ask whether petitioners have provided evidence that they are 'incarcerated under conditions posing a substantial risk of serious harm.' *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. . . . The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are 'incarcerated under conditions posing a substantial risk of serious harm.' *Farmer*, 511 U.S. at 834.

961 F.3d at 840. Indeed, the same is true in this case. The objective component of the deliberate indifference is met.

Next, Plaintiff must establish the subjective component: that Defendants' state of mind was sufficiently culpable, and must demonstrate that the officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Harrison*, 539 F.3d at 518; "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* In this instance, it would be difficult for Defendants to argue in good faith that they were not aware of the

13


health risk posed by the virus, as reports of it has dominated the news cycle since at least March of 2020. However, the inquiry is whether Defendants acted unreasonably in light of this information.

In *Wilson*, the Sixth Circuit held that "[t]he key inquiry is whether the [prison] responded *reasonably* to th[is] risk." *Wilson*, 961 F.3d at 840 (citing *Farmer,* 511 U.S. at 844 (emphasis added)). There, the plaintiffs, inmates at Elkton prison, "on behalf of themselves and current and future inmates at Elkton, allege[d] that their confinement in the midst of the COVID-19 outbreak violates the Eighth Amendment." *Wilson*, 961 F.3d at 835. In this case, in support of their argument that Defendants and the MDOC have acted reasonably in light of the pandemic, Defendants argue:

> MDOC has established itself as a national leader in prison COVID-19 responses, taking measures as early as March 2020 which included (a) ceasing all in-person visitation, (b) requiring an extra layer of approval for facility transfers, (c) implementing screening measures for all persons seeking entry to MDOC facilities, (d) ensuring more frequent cleanings of prison cells took place, (e) ensuring prisoners had adequate access to soap for handwashing, (f) displaying CDC posters detailing hygiene practices throughout MDOC facilities, (g) encouraging and enforcing social distancing, and (h) taking measures to minimize in-person attendance at parole board hearings.

(ECF No. 25, PageID.176.)

The steps taken by the Elkton prison administration in *Wilson* were not significantly different from the steps taken in this case, *see Wilson*, 961 F.3d at 841; there, the Sixth Circuit held that "while the harm imposed by COVID-19 on inmates at Elkton 'ultimately [is] not averted,' the BOP has 'responded reasonably to the risk' and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights." *Id*. (quoting *Farmer*,

14

511 U.S. at 844.) Notably, *Wilson* points out that "[o]ur sister circuits have concluded that similar actions by prison officials demonstrate a reasonable response to the risk posed by COVID-19." *Id*. (citing *Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020) (per curiam); *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam); *Marlowe v. LeBlanc*, No. 20-30276, 810 Fed. Appx. 302 (5th Cir. Apr. 27, 2020) (per curiam). So too here, as in *Wilson*, the policies and procedures set in place by Defendants are reasonable—Defendants have not been deliberately indifferent to the virus or to the prisoners' vulnerable position. Defendants have taken department-wide measures to ensure the safety and health, to a reasonable extent, of the individuals in their care.

Specifically, the step-down unit was also a reasonable response to the pandemic and prisoner safety. Defendants point to the affidavits of Washington and MacIntire, arguing "[t]hese units were established in accordance 'with updated information from the CDC, MDHHS, local health departments and staff[,]'" and note "'[p]risoners remain in the step-down unit for at least 14 days and until a negative COVID test is obtained before being released to general population.'" (ECF No. 25, PageID.78) (citing Exhibit A, ¶ 15(b).)) They argue, citing MacIntire's affidavit, that this step-down unit was founded in "utilizing a comprehensive inmate management protocol, including a discussion of quarantine procedures and the use of COVID positive cohort units and specialized units (including step-down units) to help treat COVID positive inmates, and the criteria for considering transfers on a case by case basis using specific protocols." (ECF No. 25, PageID.178) (citing Ex. B.))

15

These policies and programs established to bring COVID positive prisoners back into general population in a safe, tiered fashion are reasonable responses under the circumstances of the pandemic. The subjective component of the Eighth Amendment standard requires that Defendants' state of mind was sufficiently culpable, and must demonstrate that the officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Harrison*, 539 F.3d at 518. Here, the step-down unit appears to have been created to *mitigate* any harm to the prisoners and general population, not as an act in disregard to the risk of harm. I suggest that this further establishes Defendants did not act unreasonably and the subjective component of the Eighth Amendment is not satisfied.

For these reasons, Plaintiff has not set forth "[f]actual allegations" that are "enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted). Based on this conclusion and the foregoing analysis, I decline to analyze Defendants' argument regarding personal involvement—indeed, even if all Defendants were personally involved, the allegations would still fail under the Eighth Amendment analysis. I suggest that all Defendants may be properly dismissed.

### E. Plaintiff's Motions

Plaintiff filed several motions of his own, including a motion for access to legal materials (ECF No. 22), to dismiss Defendants' motion (ECF No.28), and for a transfer to a different unit within his facility. (ECF No. 27.)[3] Based on the foregoing analysis and

---

[3] I note that in his motion to transfer, Plaintiff requests a transfer to a different unit within the same facility. Plaintiff alleges that he is in fear for his life and well-being after being moved into a housing unit where "C.O. Miller," previously mentioned regarding Plaintiff's blog, and another C.O., are allegedly racist and exhibit "an extreme bias

recommended dismissal of Defendants from this action, Plaintiff's various motions are rendered moot and thus are denied as such.

### F. Conclusion

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion to Dismiss (ECF No. 25) be **GRANTED**, and that Plaintiff's Motions to Dismiss Defendants' Motion (ECF No. 28), for Legal Materials (ECF No. 22), and for a Transfer (ECF No. 27), be **DENIED** as moot.

## III. REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d

---

and bigoted prejudice against black men prisoners." (ECF No. 28, PageID.320.) Plaintiff does not name Defendants Washington, MacIntire, or Campbell in this motion except to say that he is threatened for exposing their "plan." As Defendants are not named in this motion, and the individuals identified herein are not named defendants in this action, I suggest this motion is not appropriately brought in this action against Washington, MacIntire, and Campbell. (*See supra* footnote 1.)

1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 15, 2021
S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge